BETTY AYALA & others [1] *vs.* BOSTON HOUSING AUTHORITY.

Suffolk.   January 4, 1989. — April 20, 1989.

Present: WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil*, Report. *Housing. Housing Authority. Contract,* Parties.
*Massachusetts Tort Claims Act.*

A municipal housing authority had a duty, pursuant to regulations promul-
gated by the United States Department of Housing and Urban Develop-
ment, to inspect for lead paint hazards in apartments rented through the
Section 8 Housing Assistance Payments Program, 42 U.S.C. § 1437f
(1982), and to notify tenants of the results of lead paint inspections.
[695-698]

The minor children of a tenant, who occupied an apartment under the aus-
pices of the Section 8 Housing Assistance Payments Program, 42 U.S.C.
§ 1437f (1982), were held to be third-party beneficiaries of the contract
between the municipal public housing authority and the Department of
Housing and Urban Development (Annual Contributions Contract) and
the contract between the authority and owners of so-called Section 8
apartments (Housing Assistance Payments contracts), to the extent those
contracts deal with the danger of lead paint in such apartments. [699-703]

Claims brought against a municipal housing authority seeking damages for
personal injuries to a tenant's minor children caused by lead paint hazards
in their apartment, rented through the Section 8 Housing Assistance
Payments Program, 42 U.S.C. § 1437f (1982), were subject to the
limitation of liability set forth in the Massachusetts Tort Claims Act,
G. L. c. 258, § 2. [703-704]

A municipal housing authority did not waive the statutory limitation on
recovery mandated by G. L. c. 258, § 2, by virtue of its purchase of a
liability insurance contract containing a clause precluding the insurer
from raising sovereign immunity as a defense in tort claims asserted
against the authority. [704-705]

CIVIL ACTION commenced in the Superior Court Department
on February 15, 1983.

[1] Amy and Starsky Ayala.

On transfer to the City of Boston Division of the Housing Court Department the case was heard by *E. George Daher*, C.J., on a motion for summary judgment, and questions of law were reported by him. The Supreme Judicial Court granted a request for direct review.

*Jeffrey M. Feuer* (*Karen L. Kruskal & Dagmar Pollex* with him) for the plaintiffs.

*John G. Ryan* for the defendant.

*Charles Harak, Nancy A. McCann, James M. McCreight & Susan M. Motika*, for Massachusetts Union of Public Housing Tenants & others, amici curiae, submitted a brief.

*Frederick U. Fierst*, for Massachusetts Non-Profit Housing Association, Inc., amicus curiae, submitted a brief.

*Erik Lund, John Egan & Richard M. Rosenthal*, for Lynn Housing Authority, amicus curiae, submitted a brief.

LIACOS, J. Amy and Starsky Ayala, children under the age of seven, and their mother, Betty Ayala (plaintiffs),[2] brought an action against the defendant, Boston Housing Authority (BHA), for failing to inspect their apartment for lead paint hazards and for failing to enforce elimination of lead paint hazards. They alleged that the children were poisoned after they ingested lead paint in their apartment in Boston. A judge of the Boston Housing Court granted the defendant's motion for summary judgment and reported certain questions to the Appeals Court. We granted direct appellate review. We vacate the judgment of the Housing Court and remand the matter to that court for further proceedings.[3]

1. *Procedural history.* The plaintiffs originally filed their action against the owner of the subject premises in 1983, and the case was transferred to the Boston Housing Court in February, 1984. In January, 1985, the plaintiffs amended their

---

[2] Betty Ayala brought her claim as mother and next friend of Amy and Starsky Ayala. She did not pursue any loss of consortium claims. Our discussion of the "plaintiffs" thus refers to the rights of the minor plaintiffs.

[3] We acknowledge the considerable assistance we have received from the amicus briefs filed by the Lynn Housing Authority; by the Massachusetts Non-Profit Housing Association, Inc.; and by the Massachusetts Union of Public Housing Tenants, Massachusetts Tenants Organization, and Massachusetts Coalition for the Homeless.

complaint to add the BHA and the city of Boston as defendants. The amended complaint, in counts 15-19, alleged that the BHA had been negligent and asserted violations of the plaintiffs' contractual third-party beneficiary rights, as well as violations of G. L. c. 93A (1986 ed.).

After a number of procedural developments not pertinent to the subject of this appeal, the BHA, on September 25, 1987, filed a motion for summary judgment as to counts 15-19 of the amended complaint. The BHA claimed in its motion that it owed no tort, contractual or other duty to the plaintiffs. A judge of the Housing Court, on November 3, 1987, ordered entry of summary judgment in favor of the defendant BHA on all counts and dismissed the plaintiffs' complaint as to the BHA.

On November 18, 1987, the plaintiffs filed a request to report the judgment and order of November 3, 1987, of the Housing Court for appellate review. The BHA, on that day, filed a motion for entry of separate and final judgment, the plaintiffs' claims against the city of Boston not having been settled.[4] On December 2, 1987, the plaintiffs filed a petition to a single justice of the Appeals Court, pursuant to G. L. c. 231, § 118 (1986 ed.), appealing the order of November 3, 1987, of the Housing Court.[5]

On December 21, 1987, the Housing Court judge, in open court, allowed the motion for separate and final judgment for the BHA. On January 11, 1988, the judge issued a report of orders and questions. The following are the reported questions:

"1. Pursuant to the statutes, regulations and other requirements of the Section 8 Housing Assistance Payments Program (42 U.S.C., ss. 1437 et seq., 24 CFR Part 882, and 24 CFR Part 35), did the Boston Housing Authority owe any duties to the plaintiffs herein to inspect for, mon-

---

[4] Settlement between the plaintiffs and the city of Boston had not yet occurred; plaintiffs' claim against the city of Boston was settled on June 6, 1988. It appears, also, that a claim against the owner was settled.

[5] At the plaintiffs' request, the Appeals Court dismissed the plaintiffs' petition for relief on June 22, 1988, following our grant of direct appellate review.

itor, and/or enforce the elimination of lead paint hazards in the apartment which was rented to the plaintiffs through the Boston Housing Authority's Section 8 Program?

"2. If the answer to Question No. 1 is in the affirmative, can the plaintiffs recover damages from the Boston Housing Authority for a breach of those duties under the standards articulated in *Irwin* v. *Town of Ware*, 392 Mass. 745 (1984)?

"3. Do the plaintiffs, through their participation with the Boston Housing Authority in the Section 8 Housing Program, have any viable contract and/or third-party beneficiary claims for the damages alleged in the plaintiffs' complaint on which they can proceed to trial against the Boston Housing Authority?

"4. If the answer to Question No. 3 is in the affirmative, are the damages that may be recoverable under those contract or third-party beneficiary claims limited by the provisions of the Massachusetts Tort Claims Act, G. L. c. 258, ss. 1 et seq.?

"5. Do the plaintiffs, who claim to be third-party beneficiaries of the contract of insurance between the Boston Housing Authority and the Atlanta International Insurance Company, have standing, as non-parties to that contract, to seek an interpretation of the provisions of that insurance contract?

"6 If the answer to Question No. 5 is in the affirmative, and where the applicable insurance contract entered into by the Boston Housing Authority provided for coverage in excess of the tort liability limits imposed by the Tort Claims Act and where the policy also included the following clause:

"'It is agreed that the [Insurance] Company shall not contend in the event of any claim, that the Named Insured [Boston Housing Authority] is not liable in tort by virtue of the fact that it is a governmental instrumentality or public body,'

has the Boston Housing Authority in this case waived the
statutory limitations on recovery contained in the Tort
Claims Act to the extent of the policy limits of its insurance
policy?"

2. *Procedural issues.* We must, as a preliminary matter,
determine whether this case is properly before us. Under Mass.
R. Civ. P. 64, 365 Mass. 831 (1974), "[i]f the trial court is
of opinion that an interlocutory finding or order made by it so
affects the merits of the controversy that the matter ought to
be determined by the Appeals Court before any further proceed-
ings in the trial court, it may report such matter, and may stay
all further proceedings except such as are necessary to preserve
the rights of the parties." If separate and final judgment properly
was entered against the plaintiffs, then it would not have been
appropriate to report the questions under rule 64. In this case,
the judge allowed the defendant's motion for separate and final
judgment in open court, as the docket for December 21, 1987,
notes. The plaintiffs sought to preserve their right to appeal
from a final judgment by filing a petition to a single justice
of the Appeals Court pursuant to G. L. c. 231, § 118. Appar-
ently relying on the propriety of the judge's report, considering
that we have accepted the reported questions for direct appellate
review, the plaintiffs requested the Appeals Court to dismiss
their petition. "In light of that reliance, fairness requires that
we treat the claims . . . as if they were here on appeal . . . ."
*Alberts* v. *Devine*, 395 Mass. 59, 65 (1985).

3. *Facts.* The defendant, in its motion for summary judg-
ment, made the following statement: "[T]he plaintiffs have
alleged that the Defendant was negligent in its inspections of
the Plaintiffs' Section 8 apartment. There is no material dispute
as to the Plaintiffs' allegations."[6] We summarize the facts
based on the plaintiffs' allegations.

---

[6] Despite this, the BHA asserts in its brief that many material facts are
disputed. As we view the record, the judge's rulings were solely based on
his view of the law applicable to the plaintiffs' claim. He did not rule, or
report, on plaintiffs' c. 93A claims (counts 18-19), and we do not consider
these questions to be before us. As to the negligence and contract counts
(counts 15-17), we consider his rulings to be either under Mass. R. Civ. P.
56, 365 Mass. 824 (1974), or Mass. R. Civ. P. 12 (c), 365 Mass. 754

In October, 1978, the plaintiffs became tenants in an apartment at 239 Bowdoin Street in the Dorchester section of Boston. After December 28, 1978, Robert Abelow, as trustee of the Abelow Investment Trust (owner), owned and managed the apartment. The owner told the plaintiffs that the apartment was lead free. Nevertheless, throughout the tenancy, the apartment had a level of lead in the paint, plaster, and other materials on exterior and interior surfaces that was hazardous to the health and well-being of children.

The defendant BHA participates as an administrator in the Section 8 Housing Assistance Payments Program, 42 U.S.C. § 1437f (1982). In connection with this program, the defendant entered into an Annual Contributions Contract (ACC) with the United States Department of Housing and Urban Development. Under the terms of this contract, a Public Housing Authority (PHA), in this case the BHA, receives funds from the Federal government and subsidizes the rent of certain eligible low income families who are tenants in privately owned housing units. The PHA then enters into Housing Assistance Payments (HAP) contracts with owners of the subject apartments.

On March 21, 1980, the defendant and the owner entered into a HAP contract, the purpose of which was to "Lease a Decent, Safe, and Sanitary dwelling unit" to the plaintiffs, with the assistance of subsidies paid to the owner by the defendant for the benefit of the tenant, Betty Ayala, who was specifically named. On April 1, 1980, the plaintiff Betty Ayala and the owner signed a Housing Assistance Payments Program Dwelling Unit Lease (lease). In the lease, the defendant signed a "certification" stating that "[t]he terms and conditions of this lease and the unit described herein meet or exceed the minimum standards of our program regulations: I therefore recommend the unit for inclusion in our program."[7]

_____

(1974) (judgment on the pleadings). Hence we answer the reported questions, assuming the allegations of counts 15-17 to be true.

[7] In this lease it was also provided that: "If constructed prior to 1950, the dwelling unit is in compliance with the HUD Lead Based Paint Regulations, 24 CFR, Part 35, which require that all interior surfaces and those exterior surfaces, such as stairs, decks, porches, railings, windows and doors, which are readily accessible to children under seven (7) years of age, be free of

The defendant knew that children under six years of age would be living in the apartment. The defendant failed to inspect the apartment for lead before approving the premises for a rent subsidy and failed to inspect the apartment at any other time.

In August, 1980, the Ayala children were diagnosed as having elevated levels of lead in their blood. The Lead Poisoning Prevention Center of the city of Boston's department of environmental affairs (Center) received notice of the plaintiffs' elevated levels of lead in their blood. On August 22, 1980, the Center inspected the plaintiffs' apartment and certified that paint on the interior and exterior surfaces of the apartment and the building contained dangerous levels of lead. The Center notified the owner of the presence of dangerous levels of lead paint in the apartment.

From August, 1980, to May, 1983, the owner failed adequately to cover areas containing lead paint, or to remove the paint, despite repeated notice from the Center that lead paint remained in the apartment. Throughout this time period, the defendant took no action to compel the owner to remove the lead paint hazard. The plaintiffs vacated the premises in May, 1983.

Plaintiffs Amy and Starsky Ayala were found to have very high and dangerous levels of lead in their blood. They had to be hospitalized numerous times and required painful and repeated medical examinations, tests, and treatment, which caused them suffering and interruption of their ordinary daily life and childhood development.

4. *Section 8 duties.* The first issue we address is whether the BHA had a duty to inspect for lead paint hazards in the plaintiffs' apartment. We agree that, under the Section 8 Hous-

---

cracking, scaling, peeling, chipping and loose paint or that such surfaces have been either adequately treated or covered to prevent the eating of lead based paint. All surfaces to be treated have been thoroughly washed, sanded, scraped or wire brushed, so as to remove all cracking, scaling, peeling, chipping and loose paint before repainting with, at a minimum, at least two (2) coats of a suitable nonleaded paint. All surfaces to be covered have had the paint removed or covered with material such as gypsum wallboard, plywood, drywall, plaster, or other suitable material."

ing Assistance Payments Program, the defendant had a duty to inspect for lead paint hazards.

The Section 8 Housing Assistance Payments Program, 42 U.S.C. § 1437f (1982), is one component of the United States Housing Act of 1937, 42 U.S.C. §§ 1437 et seq. (1982). The purpose of that Act is to provide "decent, safe, and sanitary dwellings within the financial reach of families of low income." 42 U.S.C. § 1437 (1982).

The Department of Housing and Urban Development (HUD) has promulgated regulations to implement the mandate of the Housing Act. Certain provisions in these regulations delineate the responsibilities of the parties involved in the Section 8 Housing Assistance Payments Program.

The regulations in effect at the time of this case provided that the PHA (in this case, BHA) "shall be responsible for the following: . . . . Inspections prior to leasing and inspections at least annually to determine that the units are maintained in Decent, Safe, and Sanitary condition, and notification to Owners and Families of PHA determinations." 24 C.F.R. § 882.116 (o) (1980). The regulations also provided:

> "(1) Before approving a lease, the PHA shall inspect the unit for compliance with the PHA's housing quality standards as established in accordance with § 882.109, or cause it to be so inspected on the date on which the Owner indicates that the unit will be ready for inspection, or as promptly as possible thereafter. (2) If there are defects or deficiencies which must be corrected in order for the unit to be Decent, Safe, and Sanitary, the Owner shall be advised by the PHA of the work required to be done. Before a Contract is executed, the unit must be reinspected to ascertain that the necessary work has been performed and that the unit is Decent, Safe, and Sanitary." 24 C.F.R. §§ 882.210 (d) (1) and (2) (1980).

Additionally, the regulations provided: "In addition to the initial inspection provided under § 882.210 (d) (1), the PHA will inspect or cause to be inspected each dwelling unit leased

to an Eligible Family at least annually and at such other times as may be necessary to assure that the Owner is meeting his obligations to maintain the unit in Decent, Safe, and Sanitary condition . . . ." 24 C.F.R. § 882.211 (b) (1980).

Under the regulations, an apartment is "Decent, Safe, and Sanitary," if the enumerated housing quality standards in § 882.109 are satisfied. 24 C.F.R. § 882.102 (1980).

The housing quality standard governing lead paint is as follows: "The dwelling unit shall be in compliance with HUD Lead Based Paint regulations, 24 CFR, Part 35, issued pursuant to the Lead Based Paint Poisoning Prevention Act. 42 U.S.C. 4801. And the Owner shall provide a certification that the dwelling is in accordance with such HUD Regulations." 24 C.F.R. § 882.109 (i) (l) (i) (1980).[8] Under these provisions the BHA had an obligation to inspect the unit to determine if it was in compliance with the HUD Lead Based Paint regulations promulgated under the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4801-4846 (1982).

The Lead Based Paint regulations provided as follows:

"(a) Prior to the occupancy of HUD-associated housing, immediate hazards shall be eliminated by the most practicable means. For this purpose, all defective paint conditions shall be assumed to be immediate hazards.[9]

". . . .

"(1) HUD-associated housing shall be inspected to determine whether or not immediate hazards exist. Responsibility for such inspections shall be as follows:

". . . .

"(vii) In housing assisted with Community Development funds, the appropriate local public agency, local

---

[8] The certification requirement imposes an additional obligation on the owner to certify that the HUD regulations have been followed. In our view, the fact that the owner has such an obligation does not relieve the BHA of its own obligation under 24 C.F.R. § 882.210 (d) (1) and (2), and § 882.211 (b) (1980). Additionally, see the obligation imposed on the "appropriate public agency" by 25 C.F.R. § 35.24 (a) (1) (vii) (1980), quoted *infra.*

[9] The regulations define "immediate hazard" as "paint (which may contain lead) on applicable surfaces which is cracking, scaling, chipping, peeling

public body, city demonstration agency or unit of local government or agency thereof shall be responsible for inspection of the premises . . . ." 24 C.F.R. §§ 35.24 (a), (b) (1) (vii) (1980).[10]

The BHA has conceded that it has a duty to inspect for lead paint hazards under these regulations. The BHA acknowledged in its brief, "By 24 C.F.R. 35.24 (b) (1) (v) and (vii), an inspection duty as to these 'immediate hazards' is put on the PHA. The regulations make it clear that the inspection duty on a public housing authority is an inspection duty and involves only 'immediate hazards' as defined. Such an immediate hazard is paint that is 'cracking, scaling, chipping, peeling or loose.' " We agree with the BHA's analysis that, under the regulations, it had a duty to inspect for immediate lead paint hazards. The BHA also had a duty to notify the plaintiffs of the results of their lead paint inspection. 24 C.F.R. § 882.116 (o) (1980).[11]

---

or loose." 24 C.F.R. § 35.3 (i) (1980).

"Defective paint condition" is defined as "any paint on applicable surfaces which is cracking, scaling, chipping, peeling or loose." 24 C.F.R. § 35.3 (j) (1980).

The regulations define "Applicable surfaces" as "all interior surfaces, whether accessible or not, and those exterior surfaces such as stairs, decks, porches, railings, windows and doors which are readily accessible to children under 7 years of age." 24 C.F.R. § 35.3 (g) (1980).

[10] The regulations also provided: "(2) Notwithstanding the requirements of paragraph (b) (1) of this section, in the Section 8 Housing Assistance Payments Program . . . the owner of the assisted housing shall be responsible for providing a certification to the local HUD staff, the local public housing agency or the state housing agency, if any, that the property has been inspected and treated in accordance with the applicable provisions of this part." 24 C.F.R. § 35.24 (b) (2) (1980). Again, we read this provision to require the owner to provide the certification, in addition to the BHA's obligation to inspect for lead paint hazards.

[11] Under the regulations, it is less clear what actions the BHA was required to take on the owner's failure to eliminate the lead paint hazard. The regulations provided: "If the PHA notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the PHA may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments . . . and termination of the Contract." 24 C.F.R. § 882.211 (c) (1980).

The regulations also provided that one responsibility of the BHA is the "[a]dministration and enforcement of Contracts with Owners and taking of

5. *Contractual liability.* The plaintiffs assert that, as third-party beneficiaries of the Annual Contributions Contract (ACC) and of the Housing Assistance Payments (HAP) contract, they are entitled to recover damages flowing from the defendant's breach of its obligation to inspect for lead paint hazards under those contracts. We agree that the plaintiffs are third-party beneficiaries of these contracts to the extent the contracts deal with the danger of lead paint.[12]

In order for a third party to recover for breach of a contractual obligation, he must show that he was an intended beneficiary. See *Flattery* v. *Gregory*, 397 Mass. 143, 148 (1986); *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195 (1982); Restatement (Second) of Contracts § 302 (1981).[13] "[W]hen one person, for a valuable consideration, engages with another, by simple con-

---

appropriate actions in cases of noncompliance or default." 24 C.F.R. § 882.116 (q) (1980). The BHA thus has the obligation to enforce the contract. Read together, the two provisions require the BHA to take at least some "appropriate action" to require that the owner achieve compliance with the terms of the contract. This is a further manifestation of the statutory and regulatory scheme designed to require the PHA (BHA) to take action to further the safety of children such as the plaintiffs in this case. See 24 C.F.R. § 35.3 (g) (1980). See generally *Attorney Gen* v. *Brown*, 400 Mass. 826, 827 n.2 (1987) ("Section 8 of the United States Housing Act of 1937 established a program 'for the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing.' 42 U.S.C. § 1437f[a] [1982]").

[12] Count 16 of the amended complaint alleges, on behalf of all plaintiffs, a breach of contract. Count 17 repeats the same allegations under a third-party beneficiary theory. We need answer only under the third-party beneficiary theory, as the children had no contractual arrangement with the BHA, and because, in our view, only these plaintiffs can be viewed as intended third-party beneficiaries of the lead paint provisions. We express no view as to whether an adult tenant may be a third-party beneficiary of other contractual provisions.

[13] Restatement (Second) of Contracts § 302 (1981) provides: "[1] Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

tract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement." *Flattery* v. *Gregory, supra* at 148, quoting *Brewer* v. *Dyer*, 7 Cush. 337, 340 (1851).

We examine each contract in turn to determine whether the plaintiffs may recover as intended beneficiaries.

a. *The ACC.* The primary purpose, if not the only purpose, of the ACC was to benefit individuals such as the plaintiffs. The contract provided that "[t]he PHA shall use the Annual Contribution solely for the purpose of providing Decent, Safe, and Sanitary dwellings for Families in compliance with all applicable provisions of the Act and all regulations issued pursuant thereto." The contract provided that "[t]he PHA is undertaking to provide Decent, Safe, and Sanitary housing for Families . . . pursuant to Section 8 of the Act by means of Housing Assistance Payments Contracts . . . with Owners."

The BHA specifically promised to inspect the apartments which were the subject of the contract and to require the owners to keep the apartments in decent, safe, and sanitary condition. The contract provided: "(b) The PHA shall inspect or cause to be inspected dwelling units and related facilities prior to commencement of occupancy by Families, and thereafter at least annually, adequate to assure that Decent, Safe, and Sanitary housing accommodations are being provided and that the agreed-to services are being furnished."

The HUD regulations having been incorporated by reference into the contract, the BHA thus obligated itself to inspect for immediate lead paint hazards and to notify the plaintiffs of its findings.

Recognizing a right to enforce these promises against the BHA "is appropriate to effectuate the intention of the parties." *Flattery* v. *Gregory, supra* at 148, quoting Restatement (Second) of Contracts § 302 (1981). When faced with liability for breach of its contractual duty to inspect for, and oversee the remedying of, lead paint hazards, the BHA will have a strong incentive to achieve the goals of the Federal statutes and regulations. We conclude also that HUD, the promisee, intended the plaintiffs to benefit. *Id.* To rule that these plaintiffs were

not intended beneficiaries would mock the very goals which Congress and HUD set out to achieve through the Section 8 program, at least as to the lead paint provision: to afford children of families of meager means a decent, safe, and sanitary place to live.

Several Federal courts, in analyzing the ACC, have reached the same conclusion. In *Ashton* v. *Pierce*, 716 F.2d 56 (D.C. Cir. 1983), the court concluded that the Department of Housing and Urban Development had a duty "to monitor and enforce the [Housing] Authority's compliance with the lead-based paint regulations." *Id.* at 66. The court stated: "We are convinced that the Annual Contribution Contract between the Department and the Authority affords appellees a legal basis for enforcing any duties inhering in the Contract. The mutual promises contained in the Contract were intended by the parties to benefit appellees. . . . Indeed, it is difficult to imagine any purpose for the Contract other than to benefit the tenants of public housing. . . . Thus, appellees are third-party beneficiaries of the Contract and may enforce the duties arising under it." (Citations omitted.) *Id.*

In *Concerned Tenants Ass'n of Father Panik Village* v. *Pierce*, 685 F. Supp. 316 (D. Conn. 1988), the court held that the tenants' complaint supported a claim that the public housing authority had breached certain provisions of the ACC requiring the housing authority to maintain the units in a decent, safe, and sanitary condition. *Id.* at 322, 324. The court held that: "The ACC, which is entered into pursuant to the Housing Act, does exhibit an intention to benefit the tenants directly. The provisions of the ACC make clear that it was executed primarily for the purpose of benefiting the tenants. . . . Moreover, the language of the Housing Act and its legislative history demonstrate the Congress intended that the regulatory contracts entered into pursuant to the Act were designed to benefit the tenants as a mechanism for ensuring they receive decent and safe housing. *See* 42 U.S.C. § 1437 *et seq.*" (Citations omitted.) *Id.* at 323-324. See also *Holbrook* v. *Pitt*, 643 F.2d 1261, 1271 (7th Cir. 1981) ("If the tenants are not the primary beneficiaries of a program designed to provide housing assistance

payments to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt").[14]

b. *The HAP contract.* In our view, the plaintiffs also are intended beneficiaries under the HAP contract. The contract provided that "[t]he purpose of this contract is to enable the Lower-Income Family identified in Section 1.1 [the Ayalas] to Lease a Decent, Safe, and Sanitary dwelling unit pursuant to the Section 8 Housing Assistance Payment Program."

The BHA promised to "inspect or cause to be inspected the Contract Unit and related facilities at least annually and at such other times (including prior to initial occupancy of the unit) as may be necessary to assure that the Owner is meeting his obligation to maintain the unit in Decent, Safe, and Sanitary condition . . . . The PHA shall . . . notify the Owner and the Family of its determination." [15]

We conclude that the BHA obligated itself to inspect for, and notify the tenants of, any immediate lead paint hazards as defined by the Federal regulations. Allowing the plaintiffs a right to enforce this provision will directly effectuate the express purpose of the contract — namely, to provide these plaintiffs with a decent, safe, and sanitary place to live. See Restatement (Second) of Contracts § 302. It would be bizarre indeed to conclude that the plaintiffs, the quality of whose abode was the very subject of the contract, were somehow not intended beneficiaries under the contract.[16]

---

[14] We are cognizant of the fact that at least one Federal court which has addressed the question whether tenants may be considered third-party beneficiaries under an ACC contract has reached an opposite conclusion. See *Perry* v. *Housing Auth. of Charleston,* 664 F.2d 1210, 1218 (4th Cir. 1981). We are not persuaded by that court's reasoning. Additionally, we emphasize that our ultimate conclusion rests on our own State's common law and not on Federal law. We refer to the Federal cases to illustrate how other jurisdictions have interpreted the identical contract provisions.

[15] We have discussed in part 4 of this opinion the meaning of the phrase "Decent, Safe, and Sanitary." The contract incorporated, by reference, this term as defined in the Federal statute and regulations.

[16] Section 313 of the Restatement (Second) of Contracts, which deals with government contracts, is not inconsistent with our conclusions as to either the ACC or the HAP contract. Subsection (1) of that section provides: "The rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene

In summary, under both the ACC and the HAP contract, the plaintiffs are intended beneficiaries. If the defendant breached its contractual obligations by failing to inspect for lead paint hazards as defined in the Federal regulations and by failing to take any action on behalf of the plaintiffs, they will be responsible for the consequential damages flowing from this breach. See *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 101 (1985); Restatement (Second) of Contracts § 351.[17]

We answer question no. 3, "Yes." [18]

6. *Massachusetts Tort Claims Act limitation.* A housing authority is a "public employer" within the meaning of G. L. c. 258, § 1 (1986 ed.). *Commesso* v. *Hingham Hous. Auth.*, 399 Mass. 805, 807 (1987). However, the plaintiffs argue that G. L. c. 258, the Massachusetts Tort Claims Act, does not control their contract-based claim, and that, accordingly, the $100,000 limitation of liability in G. L. c. 258, § 2 (1986 ed.), does not apply to this claim. This argument is without merit.

The plaintiffs correctly admit that, should they establish the BHA's liability in tort or in contract, they would be entitled to "only a single recovery of damages." See *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 196 (1982). Also, we have stated, with regard to a claim in contract for personal injuries, which is accompanied by a claim in tort for the same injuries, that "the measure of recoverable damages is the same." *Thomas* v. *Massachusetts Bay Transp. Auth.*, 389 Mass. 408, 410 (1983).[19]

---

the policy of the law authorizing the contract or prescribing remedies for its breach." Recognition of the plaintiffs as third-party beneficiaries furthers, rather than contravenes, the policies behind these Federal laws.

[17] We do not rely on the lease between the plaintiffs and the owners in reaching our conclusion.

[18] In light of our discussion of the BHA's contractual duties to the plaintiffs, we decline to answer question no. 1 and question no. 2, which relate to possible tort liability. The plaintiffs would be entitled only to a single recovery of damages even if they had established both a contract claim and a tort claim. See discussion in part 6, *infra*.

[19] We do not depart from the view that certain contract actions arising from the same set of facts as do tort actions potentially involve distinct measures of damages. For an extensive discussion of these principles see *Sullivan* v. *O'Connor*, 363 Mass. 579 (1973). See also Restatement (Second)

In *Scandura* v. *Trombly Motor Coach Serv. Inc.*, 370 Mass. 612, 617 (1976), we held that a contract theory of recovery "may not be used to circumvent the [statutory] limitation . . . on recovery."

Thus, a plaintiff may not avoid the requirements and limitations of the Massachusetts Tort Claims Act by designating what is essentially a personal injury claim as a contract claim. *Schenker* v. *Binns*, 18 Mass. App. Ct. 404, 406 (1984). "[T]here is 'essentially little difference between the elements of proof in a tort action for personal injury and a contract action for the same . . . . The duty of the defendant is the same whether the action is in tort or in contract.'" *Id.* at 406, quoting *Thomas* v. *Massachusetts Bay Transp. Auth., supra* at 409-410. The Massachusetts Tort Claims Act, including the $100,000 limitation for each plaintiff, applies to the plaintiffs' contract claim.

We answer question no. 4, "Yes."

7. *Waiver.* We treat question no. 5 and question no. 6 together, in light of the BHA's concession that we may assume, arguendo, the answer to be "Yes" as to the standing of the plaintiffs to seek an interpretation of the insurance contract between the BHA and the Atlanta International Insurance Company. Under question no. 6 the plaintiffs argue that, by entering into a contract of insurance for $2,000,000, the BHA waived the limitations of G. L. c. 258, § 2, by virtue of a clause in the insurance contract which provides: "It is agreed that the [Insurance] Company shall not contend, in the event of any claim, that the Named Insured [including Boston Housing Authority] is not liable in tort by virtue of the fact that it is a governmental instrumentality or public body."

The motion judge had ruled that this policy constituted no waiver of the statutory cap of $100,000 a person recovery. We agree.

---

of Contracts §§ 351-352. However, where, as here, the basis of liability involves no element of a breach of a business or commercial contract and the damages sought are tort damages, we see no basis to set aside the statutory cap in G. L. c. 258, § 2. See *Scandura, supra* at 618-619 (allowing contract actions to avoid the limitations of G. L. c. 231, § 6D [1986 ed.], would frustrate legislative purpose).

We note that G. L. c. 258, § 8 (1986 ed.), authorizes a public employer to purchase "insurance for payment of damages incurred pursuant to this chapter." There is no language in this section, or elsewhere in the statute, that warrants the conclusion that the purchase of an insurance policy will be a waiver of the statutory limitation on recovery mandated by § 2. In the absence of such an expression of legislative intent, we shall not infer it. See *Morash & Sons* v. *Commonwealth*, 363 Mass. 612, 620 (1973) (listing statutes permitting towns to purchase insurance policies). See also *Desmarais* v. *Wachusett Regional School Dist.*, 360 Mass. 591, 594 (1971) (purchase of insurance policy is not a waiver of governmental immunity). Last, even if we assume that the BHA had the power to waive the statutory cap, we see no basis for the claim that the quoted endorsement, which precludes the insurer from raising the defense of sovereign immunity as barring any tort liability, can somehow be transformed into a waiver of a statutory cap on damages to be paid.

Accordingly, assuming, arguendo, an affirmative answer to question no. 5, we answer question no. 6, "No."

8. *Disposition.* We conclude that the judge erred as matter of law in entering summary judgment for the BHA as to count 17, and in ordering the dismissal of this count of the plaintiffs' amended complaint. We conclude, however, that the judge's rulings on the statutory cap, and as to the lack of waiver by virtue of the BHA's insurance policy, were correct. The case must stand for trial. We caution that we have discussed the legal issues and have assumed facts only for that purpose. The burden, at trial, shall be on the plaintiffs to prove the essential elements of their case.

Accordingly, we reverse the judgment of the Housing Court and remand for further proceedings consistent with this opinion.

*So ordered.*