908 P.2d 250

**Susana COBOS, Personal Representative of the Estates of Socorro Morales, Luis Daniel Morales, and Crystal Selene Morales, and Individually, Plaintiff–Appellant,**

v.

**DONA ANA COUNTY HOUSING AUTHORITY, Board of County Commissioners of Dona Ana County, Lucia Archuleta, Nancy Alvillar, and Apolonio Montejano, Defendants–Appellees.**

No. 15782.

Court of Appeals of New Mexico.

Oct. 20, 1995.

Certiorari Denied Dec. 11, 1995.

Lee E. Peters, Hubert & Hernandez, P.A., Las Cruces, for plaintiff-appellant.

Mary T. Torres, Thomas A. Sandenaw, Jr., Law Office of T.A. Sandenaw, Las Cruces, for defendants-appellees.

Paul M. Schneider, Legal Bureau, Risk Management Division, Santa Fe, for amicus curiae New Mexico General Services Department Risk Management Division.

## OPINION

BOSSON, Judge.

1. Socorro Morales and her two children were killed by smoke inhalation when an early morning fire engulfed the house they were renting. The house was not equipped with a smoke alarm. Susana Cobos, personal representative for her daughter and grandchildren, brought suit against the Board of County Commissioners of Dona Ana County (the County), the Dona Ana Housing Authority (the Housing Authority), and various upper-level management personnel of the Housing Authority, for wrongful death under theories of negligence, breach of contract, and violation of civil rights. On several motions for summary judgment, the trial court

dismissed all Defendants on all counts. We affirm the judgment below.

## FACTS

2. The United States Department of Housing and Urban Development contracts with the Housing Authority to create a Section 8 Existing Housing Program. Under a Section 8 program, the federal government subsidizes rent paid by low income families to owners of private housing. *See* 42 U.S.C. §§ 1437a, 1437c, 1437f (1988) (Public Housing Act). Under federal regulations, the County is required to inspect Section 8 private housing prior to occupancy and once a year thereafter to ensure that the rented houses are "decent, safe, and sanitary." *See* 42 U.S.C. § 1437; 24 C.F.R. § 882.116(*o*) (1994).

3. Socorro Morales participated in the Section 8 Program and applied for a subsidy to rent housing from Terry Rodriguez, the owner. The Housing Authority entered into a Housing Assistance Payments Contract (HAP contract) with Rodriguez. The HAP contract required that Rodriguez keep the house "decent, safe and sanitary." Socorro Morales was not a party to the contract.

4. On December 23, 1988, a housing specialist for the Housing Authority inspected and approved the Rodriguez house in accordance with federal guidelines. A week later, Morales and Rodriguez entered into a lease agreement and Morales moved into the house. The Public Housing Act did not specifically require smoke alarms in Section 8 Housing. However, the County passed its own ordinance in March 1989 which adopted the Life Safety Code of the National Fire Protection Association and required smoke alarms in all residential structures in the county, including the Rodriguez house. The Rodriguez house did not have a smoke alarm. On November 2, 1989, the Housing Authority again inspected the house. It was still not equipped with a smoke alarm. The housing inspector was unaware of the new county ordinance, and the house passed inspection.

5. A year later, on November 11, 1990, hot gases escaping from the fireplace set the roof on fire. Everyone in the house was asleep. Without a smoke alarm, Morales and her two children never awoke in time to escape the fire, and all three perished. Two years later, Cobos brought suit for the deaths of her daughter and grandchildren.

## DISCUSSION

*Negligence Claims Under the Tort Claims Act*

6. The New Mexico Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl. Pamp.1989) (the Act), provides immunity to governmental agencies and their employees from tort actions; however, the Act specifically waives immunity for certain acts or omissions. Section 41–4–6 of the Act provides a waiver of liability for negligence arising out of the "operation or maintenance of any building, public park, machinery, equipment or furnishings."[1] Cobos claims that negligent inspection of the rental home led to her family's death. Cobos argues that negligent inspection falls within the meaning of "operation or maintenance" of a building. She points to the lack of any specific language limiting that phrase as well as the perceived remedial purpose of the Act and the broad interpretation of premises liability rendered in recent opinions of our Supreme Court. *See Bober v. New Mexico State Fair*, 111 N.M. 644, 652, 808 P.2d 614, 622 (1991); *Castillo v. County of Santa Fe*, 107 N.M. 204, 206, 755 P.2d 48, 50 (1988).

7. We believe Cobos stretches the meaning of Section 41–4–6 too far. This Section has never been extended to injuries arising from the operation or maintenance of private property. The Act has only been applied to property in which the government has an interest. Cobos forthrightfully concedes the point but argues that Section 41–4–6 extends to private property when government owes a specific duty of inspection and the property is used for a public purpose. We do not agree.

8. New Mexico cases specifically decline to expand the definition of "operation or maintenance" to the point of inspection or

---

1. In light of our discussion and holding on the Tort Claims Act issues we need not decide whether the July 1992 amendments to the definition of "maintenance" would apply to this case.

regulation of private property. In *Martinez v. Kaune Corp.*, 106 N.M. 489, 490, 745 P.2d 714, 715 (Ct.App.), *cert. denied*, 106 N.M. 439, 744 P.2d 912 (1987), we held the state did not waive immunity for negligent inspection of food in a private supermarket. Inspection was too broad and all-encompassing to fit logically within the scope of "operation or maintenance" of a building. The opinion stated:

> To do so would open the door to liability for virtually all activities licensed or inspected by state agencies. The licensing scheme is too pervasive to extend such liability to the state. Imposing such liability would circumvent the very grant of immunity provided by the Tort Claims Act, subject to the specific waivers of immunity outlined in Sections 41-4-5 to -12. The "operation or maintenance of any building" waiver of immunity provided by Section 41-4-6 cannot extend to the state's licensing or inspection.

*Id.* 106 N.M. at 492, 745 P.2d at 717. Although a portion of our holding in *Martinez* was later rejected in *Bober*, 111 N.M. at 652 n. 9, 653, 808 P.2d at 622 n. 9, 623 this part of the opinion remains authoritative and has been followed in other circumstances. *See Caillouette v. Hercules, Inc.*, 113 N.M. 492, 499, 827 P.2d 1306, 1313 (Ct.App.) (holding "operation or maintenance" does not extend to state inspection of private motor vehicle), *cert. denied*, 113 N.M. 352, 826 P.2d 573 (1992); *see also Armijo v. Department of Health & Env't*, 108 N.M. 616, 618, 775 P.2d 1333, 1335 (Ct.App.1989) (holding inspection and licensing does not constitute "operation" of mental health facility). *See generally Garry v. Payne*, 224 N.J.Super. 729, 541 A.2d 293 (1988) (holding city immune under the Tort Claims Act for negligence arising from inspection of boarding house).

9. Even where governmental action is not confined to inspection or licensing, recent opinions of our courts focus exclusively on public property when discussing Section 41-4-6. In *Bober*, the Court described premises liability under Section 41-4-46 as follows: " '[W]here due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government.' " *Bober*, 111 N.M. at 653, 808 P.2d at 623 (quoting *Castillo*, 107 N.M. at 205, 755 P.2d at 49). In *Caillouette*, the victim's family alleged that a state police officer had negligently supervised the clean-up operation of a highway accident by carelessly inspecting a semi-trailer containing explosive powder which later exploded during repair work on the trailer. This Court declined to hold that inspection by the state police constituted "operation" or "maintenance" of a motor vehicle under Section 41-4-5. We observed that "the machinery that caused the injuries resulting in death was privately owned and operated." *Caillouette*, 113 N.M. at 499, 827 P.2d at 1313. This reasoning in *Caillouette* corresponds to the identical phrase in Section 41-4-6. Consequently, we hold that the County does not waive tort immunity under Section 41-4-6 for negligent inspection of a private building.

10. Cobos correctly notes that the public entity need not always be a fee owner of a building to incur premises liability. For example, a state agency that leases a private office building and assumes responsibility for its operation or maintenance could arguably be liable under Section 41-4-6 if state employees cause injury to the public. *See Bober*, 111 N.M. at 648, 808 P.2d at 618; *cf. Ford v. Board of County Comm'rs*, 118 N.M. 134, 139, 879 P.2d 766, 771 (1994) (holding county liable where it was owner of commercial building and exercised control over premises). However, for premises liability under Section 41-4-6, the governmental entity must be shown to have both a legal interest and control of the property. The element of a legal interest is consistent in case law, and it is missing here. Responsibility for inspection may have given the County some measure of control over the property. But our courts have never equated control alone with the specific duty of "operation or maintenance." We decline to do so here.

11. Cobos also argues that she can sue under the Act for (1) negligence per se based on a breach of the county smoke alarm ordinance; and (2) bystander recovery under a theory of negligent infliction of emotional distress. Under both theories, Cobos notes

that the County has a prescribed duty of care, and she seeks to sue under the Act for breach of that duty. We may assume that a duty exists under either theory. *See Folz v. State,* 110 N.M. 457, 469–71, 797 P.2d 246, 258–60 (1990); *Ramirez v. Armstrong,* 100 N.M. 538, 540, 673 P.2d 822, 824 (1983). However, a duty of care does not automatically lead to a waiver of immunity under the Act.

■ 12. Under the Tort Claims Act, duty is not the only issue. The question is whether the acts or omissions that give rise to such a duty fall within the list of governmental activity for which the legislature has specifically waived sovereign immunity. For example, in *Folz,* the victim's representative first had to establish negligence in the maintenance of a highway before she could then argue for extended recovery to bystanders. Cobos has not met the first test under the Act, and therefore we need not address her claim for bystander recovery under *Folz,* or per se liability for violation of a statute. *See Pemberton v. Cordova,* 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct.App.1987); *see also Martinez,* 106 N.M. at 491, 745 P.2d at 716 (holding that a breach of statutory duty does not waive immunity under Section 41–4–6 without also showing that duty fits within the definition of operation or maintenance under the Act); *see also California First Bank v. State,* 111 N.M. 64, 68, 801 P.2d 646, 650 (1990) (refusing to extend immunity waiver under the Act for law enforcement officers to all governmental actors who concurrently cause the injury producing conduct of law enforcement officers).

13. Finally, Defendants contend that Cobos failed to give timely notice of her claims under the Tort Claims Act, and we agree. Section 41–4–16(C) requires written notice of a wrongful death claim against a governmental entity within six months of the occurrence unless there was actual notice. Cobos admits there was no written notice but contends that the County and the Housing Authority received actual notice.

■ 14. Actual notice is established when "the agency allegedly at fault ... [has] actual notice that litigation will likely be the result of the accident." *Powell v. New Mexi-co State Highway & Transp. Dep't,* 117 N.M. 415, 419, 872 P.2d 388, 392 (Ct.App.), *cert. denied,* 117 N.M. 524, 873 P.2d 270 (1994). On November 13, two days after the fire, Cobos went to the Housing Authority and informed appropriate personnel about the fire and about the absence of a smoke alarm. Although the County knew about the fire and its possible causes, the Defendants did not have actual notice that Cobos would bring a claim against the County. Cobos never told the Housing Authority that she contemplated litigation nor did she inquire specifically about the potential liability of the Housing Authority. Instead one of the Defendants advised her to consult an attorney. *See Dutton v. McKinley County Bd. of Comm'rs,* 113 N.M. 51, 53, 822 P.2d 1134, 1136 (1991); *Frappier v. Mergler,* 107 N.M. 61, 64–65, 752 P.2d 253, 256–57 (1988); *Powell,* 117 N.M. at 419, 872 P.2d at 392; *cf. Callaway v. New Mexico State Dep't of Corrections,* 117 N.M. 637, 640–41, 875 P.2d 393, 396–97 (Ct.App.) (holding question of fact as to actual notice where letter to defendant from plaintiff's attorney, and prison chaplain allegedly informed of intended lawsuit), *cert. denied,* 118 N.M. 90, 879 P.2d 91 (1994). *See generally* Donald M. Zupanec, Annotation, *Actual Notice or Knowledge by Governmental Body or Officer of Injury or Incident Resulting in Injury as Constituting Required Claim or Notice of Claim for Injury—Modern Status,* 7 A.L.R.4th 1063, 1066 (1981). The Housing Director then met privately with the county attorney to discuss the fire and any legal consequences. Under these undisputed facts, we hold Defendants did not have actual notice that litigation would likely result from this occurrence.

*Contract Claim*

■ 15. Cobos next argues that she was a third-party beneficiary to the HAP contract between the Housing Authority and Rodriguez. Cobos seeks to enforce language in the contract requiring the rental house to be "decent, safe, and sanitary." Under well-settled law, the third party must show "that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries." *Valdez*

*v. Cillessen & Son, Inc.,* 105 N.M. 575, 581, 734 P.2d 1258, 1264 (1987). According to the weight of authority, HAP contracts are usually intended to benefit tenants like Cobos. As one court states: "If the tenants are not the primary beneficiaries of a program designed to provide housing assistance payments to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt." *Holbrook v. Pitt,* 643 F.2d 1261, 1271 (7th Cir.1981); *see Henry Horner Mothers Guild v. Chicago Hous. Auth.,* 780 F.Supp. 511, 515–16 (N.D.Ill. 1991); *Tinsley v. Kemp,* 750 F.Supp. 1001, 1012 (W.D.Mo.1990); *McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233, 248–50 (S.D.N.Y.1989); *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 620 F.Supp. 806, 810 (S.D.N.Y.1985); *see also Ayala v. Boston Hous. Auth.,* 404 Mass. 689, 536 N.E.2d 1082, 1090 (1989) ("It would be bizarre indeed to conclude that the plaintiffs, the quality of whose abode was the very subject of the contract, were somehow not intended beneficiaries under the contract."). *But see Reiner v. West Village Assocs.,* 768 F.2d 31, 32–33 (2d Cir.1985); *Perry v. Housing Auth. of Charleston,* 664 F.2d 1210, 1218 (4th Cir.1981); *Smith v. Washington Heights Apartments, Ltd.,* 794 F.Supp. 1141, 1144 (S.D.Fla.1992). *See generally* Robert S. Adelson, Note, *Third Party Beneficiary and Implied Right of Action Analysis: The Fiction of One Governmental Intent,* 94 Yale L.J. 875, 888–90 (1985).

■ 16. However, our case differs from these authorities in one important respect. The HAP contract between Rodriguez and the Housing Authority specifically excludes third-party beneficiaries:

14. *PHA RELATION TO THIRD PARTIES.*

. . . .

(C). Nothing in this Contract shall be construed as creating any right of the Family or other third party (other than HUD) to enforce any provision of this Contract, or to assert any claim against HUD, the PHA or the Owner under this Contract.

Strangely, we have found no case discussing this clause, nor have the parties directed us to any such case. However, the intent of the clause is clear, and our duty is to enforce the contract as written. *See Montoya v. Villa Linda Mall, Ltd.,* 110 N.M. 128, 129, 793 P.2d 258, 259 (1990). We conclude that neither the parties to the agreement, nor the federal government, are invested with the rights asserted by Cobos. Only the express parties may enforce the rights and obligations in the contract.

■ 17. Cobos does not dispute this interpretation. Instead, Cobos argues that this clause is void, as a matter of policy, because it seeks to exculpate Defendants from their own negligence. *See Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n,* 67 N.M. 108, 118, 353 P.2d 62, 69 (1960). That may be public policy where one party to a contract tries to insulate itself from negligence. But that policy does not require parties to create rights in third parties, as is the case here. It is fundamental that "if two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the third party any direct remedy." 4 Arthur L. Corbin, *Corbin on Contracts* § 777, at 25 (1951); *see Volpe Constr. Co. v. First Nat'l Bank,* 30 Mass.App.Ct. 249, 567 N.E.2d 1244, 1249 (1991) (enforcing clauses which deny third-party rights in a contract); *Hrushka v. State Dep't of Pub. Works & Highways,* 117 N.H. 1022, 381 A.2d 326, 327 (1977) (same). This is consistent with our duty to enforce the will of the parties as it is written. Therefore, we affirm summary judgment on this claim as well.

*Civil Rights Claim*

■ 18. Under 42 U.S.C. § 1983, Cobos must demonstrate that Defendants: (1) acted under color of state law, and (2) deprived the Morales family of rights secured to them by the laws or the Constitution of the United States. *See LaBalbo v. Hymes,* 115 N.M. 314, 319, 850 P.2d 1017, 1022 (Ct.App.), *cert. denied,* 115 N.M. 359, 851 P.2d 481 (1993); *see also Wise v. Bravo,* 666 F.2d 1328, 1331

(10th Cir.1981). The parties do not dispute that Defendants were acting under color of state law. Therefore, our focus is on the second element, identifying a federally secured right.

 19. Section 1983 by itself does not create rights; it is the remedy for violation of rights arising from the Constitution or laws of the United States. *See Wise,* 666 F.2d at 1331. Cobos first ·argues that the Fourteenth Amendment to the United States Constitution creates an implicit right to "decent, safe, and sanitary" housing. We do not agree. More than two decades ago, the United States Supreme Court stated in the context of a landlord-tenant dispute:

> We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality.... Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions.

*Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).

20. Cobos next looks to the Public Housing Act as the source of a federally secured right. Relying strongly upon *Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), Cobos argues that tenants have a statutory right to "decent, safe, and sanitary" housing under the Public Housing Act which is enforceable against the state under Section 1983. Cobos is partially correct.

 21. The United States Supreme Court in *Wright* held that under certain circumstances the Public Housing Act does create enforceable rights against a local housing authority under Section 1983. In its declaration of policy, the Public Housing Act does articulate a federal policy "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of

lower income." 42 U.S.C. § 1437. Cobos is also correct that we do not have to look to the Public Housing Act itself for proof that Congress intended to create an implied cause of action for private parties. As long as Congress does not clearly foreclose private action, and Congress has not done so here, litigants may sue to enforce specific statutory rights using the vehicle of Section 1983. *See Smith v. Robinson,* 468 U.S. 992, 1012–16, 104 S.Ct. 3457, 3468–3470, 82 L.Ed.2d 746 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 19–21, 101 S.Ct. 2615, 2625–2626, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 10, 100 S.Ct. 2502, 2507, 65 L.Ed.2d 555 (1980).

22. The Supreme Court in *Wright,* however, also emphasized that an enforceable statutory right under Section 1983 requires more than just vague statutory references to public policy. *See Wright,* 479 U.S. at 432, 107 S.Ct. at 774; *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981) (statutory provisions unenforceable under Section 1983 if "intended to be hortatory, not mandatory"). The tenants in *Wright* were suing to enforce a regulatory ceiling upon rents that could be charged to low income tenants (the Brooke Amendment). The detail in the Act and the regulations made those rights enforceable under Section 1983. The Court stated: "In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce." *Wright,* 479 U.S. at 432, 107 S.Ct. at 774. The Supreme court clarified the test for "rights" enforceable under Section 1983 in *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990):

> Section 1983 speaks in terms of rights, privileges, or immunities, not violations of federal law. We must therefore determine whether the [federal statute] creates a federal right that is enforceable under § 1983. Such an inquiry turns on whether the provision in question was intend[ed] to benefit

the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

(Citations and internal quotation marks omitted.)

█ 23. The case before us is different. The statutory exhortation for "decent, safe, and sanitary" housing is just that: a goal to strive for, without anything more specific or tangible within "the competence of the judiciary to enforce." *Wright,* 479 U.S. at 432, 107 S.Ct. at 774. Federal regulations on the subject are equally vague. *See* 24 C.F.R. § 882.116(*o*) ("Inspections prior to leasing and inspections at least annually to determine that the units are maintained in Decent, Safe, and Sanitary condition."). Although certain aspects of "decent, safe, and sanitary" housing are defined in the regulations, none lend any help to Cobos here. *See* 24 C.F.R. § 882.102. For example, 24 C.F.R. § 882.109, specifically discusses sanitary facilities, kitchen and sleeping arrangements, utilities, roofing and structural conditions and other aspects of minimal condition for Section 8 housing. Precautions regarding lead-based paint receive special attention. *See* 24 C.F.R. § 882.109(i). However, fire safety is noticeably absent. Smoke detectors were not required until after October 30, 1992. *See* 24 C.F.R. § 882.109(r). Smoke detectors are not even mentioned before July 1992. *See* Section 8 Housing Assistance Payments Program for New Construction, 57 Fed.Reg. 33,851 (1992) [Vol. 57, No. 147 (Thursday, July 30, 1992)].

24. Similarly situated courts have characterized the goal of "decent, safe, and sanitary" housing as merely precatory language which falls short of a justiciable standard under Section 1983. *See Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, 525–26 (E.D.Pa.1992); *Henry Horner Mothers Guild,* 780 F.Supp. at 515; *Concerned Tenants Ass'n of Father Panik Village v. Pierce,* 685 F.Supp. 316, 322 (D.Conn.1988); *see also Suter v. Artist M.,* 503 U.S. 347, 356–69, 112 S.Ct. 1360, 1367–70, 118 L.Ed.2d 1 (1992) (statutory requirement of "reasonable efforts" by state to maintain abused children in home mandated inclusion of that term in state plan, but did not unambiguously create an enforceable right upon the beneficiaries of statute). *Hurt* is particularly instructive. In a massive tort suit based upon the pernicious effects of lead-based paint in public housing, the Court clearly stated that the "general policy provision" of decent, safe, and sanitary housing in the Public Housing Act was not enough to create a viable claim under Section 1983. *See Hurt,* 806 F.Supp. at 525. The action survived only because additional statutes and regulations specific to lead-based paint supplied the necessary detail. *See German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 553–54 (S.D.N.Y.1995); *Simmons v. Charleston Hous. Auth.,* 881 F.Supp. 225, 232 (S.D.W.Va.1995).

25. The present case lacks that same detail. The statutory language states a policy goal and no more. While additional detail may exist for other aspects of safety, the Act is silent on smoke alarms. While the regulations require annual inspections, federal law does not tell inspectors what to look for, at least not in this area of fire safety. Nothing in the Public Housing Act authorizes the type of action sought to be brought here. We cannot infer an enforceable statutory right merely from the single word "safe" in the Public Housing Act.

█ 26. Recognizing this shortcoming, Cobos reaches back to the county ordinance specifically requiring smoke alarms in residential housing. Cobos would have us engraft the county smoke alarm ordinance onto the federal language of "decent, safe, and sanitary" housing, and the result, Cobos argues, becomes sufficiently specific to pass the enforceability test of *Wilder* and *Wright.* If smoke alarms were part of the federal law (either statutory or regulatory), we might agree. Even if the County had failed to perform its annual inspection required by federal law, we might also agree. Here, however, Cobos is attempting to convert this local ordinance into a federal right. Section 1983 gives life to rights created in federal

law; nothing said in local ordinances, it seems to us, can either add to or detract from the federal law. The closest case we can find favors the County on this point. *See Crosby v. Luzerne County Hous. Auth.*, 739 F.Supp. 951, 955 (M.D.Pa.) (holding violation of local fire safety code in federally subsidized Section 8 housing did not create a cause of action under Section 1983 for death caused by fire), *aff'd*, 919 F.2d 134 (3d Cir. 1990). Cobos has not directed us to any contrary authority. Consequently, we conclude that Cobos does not have a statutory claim under Section 1983.

## CONCLUSION

27. Summary judgment for Defendants is affirmed.

28. **IT IS SO ORDERED.**

DONNELLY and ALARID, JJ., concur.