Sosman, J.
Plaintiffs Carmen Rodriguez (“Rodriguez”) and her sons, Samuel Rodriguez (“Samuel”) and Carlos Ocasio (“Carlos”), have brought the present action complaining of injuries sustained in the course of three alleged break-ins at the Rodriguezes’ apartment in the Jefferson Park public housing project, a project owned and operated by defendant Cambridge Housing Authority (“CHA”). CHA has filed a motion for partial summary judgment on the ground that certain of the claims for inadequate security are barred by G.L.c. 258, §10(j), that the alleged inadequate security was not a proximate cause of the injuries to Carlos, that Carlos has no loss of consortium claim for the injuries to his mother and brother, and that Samuel has no claim for negligent infliction of emotional distress arising from the injuries to his mother. For the following reasons, the motion is allowed in part and denied in part.
Facts
In 1985, plaintiff Rodriguez and her husband entered into a lease with CHA for premises located at 112 Jackson Place in Cambridge. The apartment is located in the Jefferson Park development, a public housing project of CHA. Rodriguez resided in the apartment with her husband and her five children (Carlos, Karen Ocasio, Ricardo Rodriguez, Betzaida Rodriguez, and Samuel).
In the lease, CHA agreed to maintain the premises in a decent, safe and sanitary condition and to comply with the requirements of the State Sanitary Code. It also agreed to make necessary repairs and replacements. With regard to repair of any defects “which pose an immediate and serious threat to health or safety,” CHA agreed that repairs would be effected within 24 to 36 hours after notification. As examples of the types of defects that would require repair within such a time frame, the lease listed “unlockable front and rear doors to apartment.” In the event that repairs to such defects were not made within the time limit specified, CHA agreed that it would offer the tenant “standard alternative accommodations (with reasonable moving cost at the CHA’s expense).”
Rodriguez was also provided with a Residents Handbook. Under the heading “Transfers to Another Apartment,” the Handbook provided that “(i]n unusual cases, tenants are permitted to move to another apartment if they can show ‘good cause.’ ” Tenants seeking transfers within the same development were to apply at the management office for that development. Tenants seeking transfers to another development were to apply at CHA’s central Tenant Selection Office. The Handbook did not define what “good cause” for a transfer would be or otherwise promise to honor transfer requests. Rather, the Handbook merely stated that transfers would be allowed in “unusual cases.”
CHA’s Applicant Selection and Transfer Plan governed the subject of tenant transfers in greater detail. The Plan outlined that transfer between different CHA developments “is considered an emergency measure and is rarely granted,” except for transfers to elderly housing, transfers from an inappropriate size unit to an appropriate size, and transfers to handicapped-accessible units. A tenant was to be transferred to a unit in another development if “continued occupancy in the tenant’s present unit presents a clear direct danger to the physical safety of the tenant or any member of the tenant household." Even then, the Plan provided that transfer would only take place if the tenant’s problem “cannot be substantially resolved by a transfer within the development or through other CHA management actions.”
Under the Plan, transfers within the same development were to be allowed “for health and safety reasons” or for reasons of unit size, but even those needs for intra-development transfers were to be “balanced against the needs of emergency applicants and other applicants on the waitlist.” The Plan provided that “[a] tenant shall be granted a transfer to another unit in the same development if necessary for serious health or safety reasons.”
In February 1990, Rodriguez’s husband moved out of the Jefferson Park apartment. Rodriguez and her five children continued to reside in the unit. Shortly thereafter, Rodriguez began requesting that she and her children be transferred out of Jefferson Park to another development. The reasons given for wanting a transfer included overall concerns about the safety of the area in and around Jefferson Park. Social workers recommended that the Rodriguez family be transferred due to unsettling events in the area, including vandalism and robbery of Rodriguez’s car, Carlos’ involvement in criminal activity with others in the neighborhood, and alleged threats against Rodriguez and her children. Rodriguez’s physician also supported her request due to excessive noise in the area (from nearby trains and from neighbors), *404 which was making it difficult for her to sleep. Her doctor’s letter also references “traumatic events” having occurred at the home and opines that Rodriguez’s therapy was “hindered by her remaining there.”
Rodriguez alleges that she filled out an application for transfer, but that someone at CHA tore the application up and never processed it. She also claims that she made numerous oral requests to be transferred, but that in response to those requests she was told that her fears were unjustified and that she was “needlessly worrying.”
Carlos moved out of the apartment in 1992. As of the spring of 1994, Rodriguez was still living at 112 Jackson Place with Karen Ocasio (then age 17), Samuel (age 12) and Ricardo Rodriguez (age 15). Plaintiffs allege that, as of 1994, the door locks for the apartment were loose and some of the window locks were inoperable. These defects were allegedly brought to the attention of the manager for the development. The locks were not repaired, nor was the family provided with alternative accommodation.
On May 12, 1994, a masked intruder broke into the apartment, assaulted Rodriguez with a knife, and threatened to kill her. She escaped by running out the back door. In their reports to the police, the family voiced their suspicions that one Joaquin Luciano was behind this attack. Luciano, the former husband of Rodriguez’s sister, had allegedly' raped his niece, Betzaida Rodriguez. He had threatened Rodriguez not to press charges. However, Rodriguez and her daughter had pressed charges and had obtained a restraining order against Luciano in April 1994. The assailant was not Luciano himself, but the family suspected that the perpetrator was a member of Luciano’s gang.
The police investigating the incident recommended to the development manager that the door locks be changed.[1] The locks were not changed, and no repairs were done.
On May 18, 1994, an intruder again broke in and attacked Rodriguez. The assailant tied her up and gagged her in such a way that she had difficulty breathing. He locked the bedroom door and began attacking her with a knife. Karen heard strange noises coming from her mother’s bedroom. She went to wake up Samuel and came with him to the bedroom door. Hearing someone approach, the assailant opened the window and jumped out. Karen and Samuel pried open the lock, entered the room and found their mother tied up in her bed and unable to breathe. Police and an ambulance were summoned to the scene. Rodriguez was untied and taken to the hospital. The family suspected that this second attack had also been perpetrated by a member of Luciano’s gang.
Samuel was also taken-to the hospital with his mother after this incident. He was hospitalized for two weeks, suffering a major depressive episode. During his hospital stay, he exhibited suicidal thoughts, sleep disturbances, nightmares and difficulty concentrating. Suicide precautions were ordered.
On June 4, 1994, after Samuel had returned home, there was another break-in at the Rodriguezes’ apartment. No one was home when the break-in occurred. Rodriguez had gone out with her boyfriend and Karen. Samuel, Ricardo and Carlos were playing ball out in the parking lot. When Rodriguez returned, she and Samuel went up to the apartment. As they entered, they heard the back door of the unit slam shut. Rodriguez screamed, and Carlos came running up to see what the problem was. In the apartment, they found shattered dishes on the floor. They checked the apartment and found no one.
A few moments later, Karen came up and reported that she had just seen Luciano walking away from the premises. Karen then called the police, and Carlos went out to find Luciano. He claims that his purpose in going after Luciano was to detain him until the police arrived. He caught up to Luciano near the entrance to the Jefferson Park complex and told Luciano that the police were on their way. Luciano pulled out a knife and came at Carlos. Carlos had a bat in his hands and swung to defend himself. Luciano cut Carlos’ wrist and hand during this confrontation.
At the time of these events, Carlos lived in an apartment on Richdale Avenue with his girlfriend and her children. He remained close to his mother and siblings and visited often at their Jefferson Park apartment. He and his girlfriend later moved to an apartment on Norfolk Street. He left that apartment sometime in 1996. He was then homeless for some period of time, staying with friends and in shelters. Sometime in 1997, he moved back in with his mother and Samuel.
Discussion
I. G.L.c. 258, §10Q)
CHA is a “public employer” within the meaning of the Massachusetts Tort Claims Act, G.L.c. 258, and tort claims may therefore not be brought against CHA unless the claim is one covered by the Act. Ayala v. Boston Housing Authority, 404 Mass. 689, 703 (1989). CHA argues that plaintiffs’ claims of negligent security are barred by the provisions of G.L.c. 258, §10(j), which provides that the Tort Claims Act shall not apply to “any claim based upon an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.”
However, exceptions to the exclusion in §10(j) include “any claim based on negligent maintenance of public property" (§10(j)(3)) and “any claim based upon specific and explicit assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or *405 household by a public employee, provided that the injury resulted in part from reliance on those assurances” (§10(j)(l)).
CHA concedes that the exception in §10(j)(3) allows plaintiffs to proceed with so much of their claim as alleges failure to repair physical defects in the apartment (i.e., defective door and window locks). Such allegations of negligent maintenance of the property may proceed under §10(j)(3). However, CHA contends that §10(j) bars plaintiffs from pursuing any more general claim of failure to provide security services or failure to transfer the family out of the development. In the absence of “explicit .and specific assurances of safety, ” as provided in § 10(j) (1), such claims are barred by the general exclusion of §10(j).
Plaintiffs claim that the lease, the Residents Handbook, and the CHA Applicant Selection and Transfer Plan provided them with “explicit and specific assurances of safety,” including a specific assurance that they would be transferred to another unit if there were health and safety reasons supporting such a transfer. Rodriguez also claims that CHA employees gave her “explicit and specific assurances of safety” when they told her that her fears were groundless, that the area was safe, and that she was worrying needlessly.
To be “explicit,” an assurance of safety must be “a spoken or written assurance, not one implied from the conduct of the parties or the situation.” Lawrence v. City of Cambridge, 422 Mass. 406, 410 (1996). To be “specific," the “terms of the assurance must be definite, fixed, and free from ambiguity.” Id. Here, there was an “explicit” and “specific” assurance that the premises (including locks) would be properly maintained and that, during any delay in repair of critical items (including locks), tenants would be provided “alternative accommodations,” but there was no assurance of any other safety measure. These assurances in the lease only cover the claim that may already be brought under §10(j)(3), i.e., the claim that CHA failed in its obligation to keep the premises in physical repair.
Neither the lease, the Residents Handbook nor the Applicant Selection and Transfer Plan provides any "explicit and specific assurance” on the subject of transfer to another unit or another development. Indeed, what the Handbook and the Plan make clear is that such transfers are “unusual” and are not to be expected. Even where a good case for transfer has been made out, the policy was to “balance” that case against the competing merits of those on the waiting list for public housing. While Rodriguez may have had good reason for wanting to move to another development, no one provided her with any “explicit and specific assurance” that her fears about the neighborhood would entitle her to a transfer.[2]
The alleged statements made by CHA personnel about Rodriguez “needlessly worrying” are not “explicit and specific assurances of safety.” At most, those statements expressed general opinions about the Jefferson Park area and/or the problems in the Rodriguez family. They did not tell Rodriguez that particular security measures would be undertaken, or indeed that anything would be done to make the development in general or her unit in particular any safer. General advice that someone worried about crime in the neighborhood should calm down or not worry about it so much is not an assurance that is “definite, fixed, and free from ambiguity.”
Accordingly, to the extent that plaintiffs’ claims are based on any theory of negligent security beyond negligence in the maintenance of the physical security of the unit (Le., the locks) and failure to provide alternative accommodations until the locks were fixed, such claims are barred by §10(j).
II. Injuries to Carlos
CHA argues that its alleged negligence in not repairing the apartment locks was not a proximate cause of the injuries sustained by Carlos in his confrontation with Luciano.[3] Plaintiffs contend that Carlos’ pursuit of Luciano comes within the “rescue” doctrine. “(N)egligence which creates peril invites rescue and, should the rescuer be hurt in the process, the tortfeasor will be held liable not only to the primary victim, but to the rescuer as well.” Barnes v. Geiger, 15 Mass.App.Ct. 365, 369 (1983).
CHA rightly points out that Carlos was not engaged in a literal “rescue” when he followed and confronted Luciano. Assuming that Luciano was the person who had just broken into the Rodriguez apartment, he was already out of the apartment and headed off the premises when Carlos decided to follow him. The damage had been done already, and there was no one in need of “rescue” by that time.
Carlos claims that his purpose in pursuing Luciano was to detain him until police arrived. Understandably, Carlos would want Luciano apprehended, both for the restraining order violation and for his suspected role in the earlier attacks on Rodriguez.[4] It is a readily foreseeable consequence of negligent security measures that persons may be injured in trying to restrain or confine the perpetrator of some crime. Coming to the aid of a crime victim may well include efforts to chase after the offender or to prevent the offender’s escape from the scene. Such conduct on the part of third parties is just as foreseeable as rescue efforts, and is closely akin to rescue itself.[5] It makes no sense to limit tort recovery only to those involved in some narrow categoiy of direct rescue of the victim’s person. Restricting the “rescue” doctrine only to conduct that is part of a literal, immediate rescue of the victim’s person ignores the broader concepts of proximate cause that give rise to the rescue doctrine.
Accordingly, CHA’s motion for summary judgment on Carlos’ claims for his own personal injuries is denied.
*406 III. Carlos’ Claims for Loss of Consortium
Carlos has also claimed for loss of society, companionship, support and services of his mother and brother. CHA argues that, as an independent adult living apart from his mother and brother, Carlos cannot bring any such loss of consortium claim.
In Ferriter v. Daniel O’Connell’s Sons, Inc., 381 Mass. 507 (1980), the court held that a minor who was dependent on his parent (both for economic support and for guidance and nurture) could bring a claim for loss of that parent’s society and companionship. In doing so, the court reiterated that it would “proceed from case to case with discerning caution” in the field of claims for loss of consortium. Id. at 516, quoting Diaz v. Eli Lilly & Co., 364 Mass. 153, 165 (1973). Plaintiff cites to no case that has allowed a claim for loss of a sibling’s society and companionship.
To date, the only case extending the rule of Ferriter to an adult child’s claim for loss of parental consortium is Morgan v. Lalumiere, 22 Mass.App.Ct. 262, review denied 398 Mass. 1103 (1986). In Morgan, the adult child plaintiff was seriously disabled, suffering from blindness, cerebral palsy and mental retardation. Due to his disabilities, he lived with and had been completely dependent on his mother for his daily care. When his mother was seriously injured in an accident, the dependent son brought his own claim for loss of consortium. On facts showing such extreme dependency, the Appeals Court allowed the plaintiff to pursue his loss of consortium claim, despite the fact that he was no longer a minor. Id. at 269-70. In later cases, the Supreme Judicial Court has referred to Morgan as premised on a “unique and intense dependency intrinsic to the relationship” between the plaintiff and the injured person. Norman v. Massachusetts Bay Transportation Authority, 403 Mass. 303, 306 (1988); Mendoza v. B.L.H. Electronics, 403 Mass. 437, 438 (1988).
The present case does not bear any resemblance to the unique facts of Morgan. Carlos was an adult at the time of these events, and he had not been living with the family for some time. He claims that his mother continued to provide him with “social support” and financial assistance and that he has recently moved back in with his mother and Samuel. These facts do not make Carlos the equivalent of a severely handicapped adult child totally dependent on his parent.[6]
In a field where the appellate courts proceed “with discerning caution,” it is not for this court to change the requirements set down by Ferriter and Morgan. In order to support a claim for loss of a parent’s society and companionship, the plaintiff child must be either a minor or, if adult, have some unique circumstance that makes the adult child intensely and unusually dependent on his parent. The courts do not recognize loss of consortium claims for all members of a family, but only for those where there is that “unique and intense dependency.” No such dependency exists on these facts, and Carlos therefore does not have any claim for loss of consortium of either his mother or his brother.
IV. Samuel’s Claim for Negligent Infliction of Emotional Distress
CHA contends that Samuel can not claim for the emotional distress he suffered from witnessing his mother’s condition because Samuel himself did not suffer “substantial physical injury.” In Dziokonski v. Babineau, 375 Mass. 555 (1978), the court recognized a claim for emotional distress suffered by a parent who came upon the scene of an accident in which her child was severely injured. In overruling the prior “impact” rule (and rejecting a “zone of danger” rule), the court set out new requirements for such a claim. At a minimum, such a plaintiff would be required to show “substantial physical injury and proof that the injury was caused by the defendant’s negligence.” Id. at 568. If those were present, liability would then depend on “where, when and how the injury to the third person entered into the consciousness .of the claimant, and what degree there was of familial or other relationship between the claimant and the third person.” Id.
In the present case, there is no question that Samuel came upon the scene in the immediate aftermath of a violent attack on his mother and found her bound, gagged, slashed and suffocating. The timing and manner in which he became aware of what happened to his mother, and his close relationship to her, would satisfy those aspects of a “bystander” claim as set forth in Dziokonski. CHA argues, however, that Samuel can not show that he himself suffered “substantial physical injury.” Neither Dziokonski itself nor any of the other “bystander” cases provides any definition of “substantial physical injury.” In Dziokonski, the plaintiff had died in the ambulance taking her daughter to the hospital. What types of “physical injury" short of death would satisfy the “substantial physical injury” requirement remains unclear.
It is also uncertain whether the “substantial physical injury" requirement of Dziokonskiis still good law. In the years following Dziokonski, several justices began to question the need for showing “physical injury” as a predicate to recovery for negligent infliction of emotional distress. See Payton v. Abbott Labs, 386 Mass. 540, 578-81 (1982) (Wilkins, J., dissenting in part, with whom Liacos and Abrams, JJ., joined); DiGiovanni v. Latimer, 390 Mass. 265, 273-74 (1983) (Liacos, J., concurring); Nancy P. v. D’Amato, 401 Mass. 516, 519 (1988) (noting that certain justices “have been willing to acknowledge that objective corroboration of a plaintiffs emotional distress may sometimes be shown in the absence of physical injury”). Ultimately, the court modified its “physical injury” requirement to require only that plaintiffs “corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness.” Sullivan v. Boston Gas Co., 414 Mass. 129, *407 137-38 (1993). Application of the simplistic “physical harm” rule had presented problems of definition, as medical science now recognizes that “all emotional disorders have physical ramifications, while all physical illnesses have emotional aspects” and “(p)hysicians themselves often cannot distinguish between the mental and physical aspects of an emotional disturbance.” Id. at 134.
CHA argues that the relaxation of the physical injury requirement in Sullivan does nothing to change the “substantial physical injury" requirement for emotional distress suffered by “bystanders” as set forth in Dziokonski In other words, CHA contends that a “bystander” claiming emotional distress from seeing someone else’s injuries must still show “substantial physical injury” and not just corroborate his mental distress with “objective evidence of harm."
The argument is not persuasive. Although Sullivan does not directly address a Dziokonski “bystander” situation, its discussion of why the “physical harm” rule was no longer strictly required for cases of negligent infliction of emotional distress is applicable to all types of claims for negligent infliction of emotional distress. The distinction between “mental” injury and “physical” injury is not the bright line that it appeared to be back when Dziokonski was decided, and it is as elusive a distinction in “bystander” cases as it is in other cases alleging negligent infliction of emotional distress.
Samuel’s claim to have suffered severe emotional distress after having seen his mother hog-tied, bleeding, and struggling to breathe is well corroborated by “objective evidence” of harm. His two-week hospitalization corroborates the seriousness of his condition. His admission for “major depressive episode” was categorized as “Emergent” (and not just “Urgent”). He was suicidal, and was placed on observation at five-minute intervals. He was “plagued by nightmares” during his hospital stay. Rejecting his claim because his suffering did not have sufficiently grave “physical” components does not comport with the reasoning of Sullivan.
There is an alternative reason for not applying the “substantial physical harm” requirement to this particular claim. Samuel’s distress, as described in the medical records, stemmed not only from seeing his mother’s condition after the May 18 attack. Understandably, Samuel felt that his own safety was threatened by these episodes. Repeated invasions of his own home, allegedly due to CHA’s negligent maintenance of the locks, threatened Samuel’s own safely, even if he was not physically attacked during such invasions. Unlike Dziokonski Samuel did not just come upon someone who had been injured by CHA’s alleged negligence. His own personal security was in danger as a result of this alleged negligence, and the terror he experienced was dramatically heightened after seeing what the intruder had done to his mother. Dziokonski imposed its “substantial physical harm” requirement to address cases where plaintiff was not “a person who was put in fear for his own safety as a result of alleged negligence of the defendant.” 375 Mass. at 562. Dziokonski rejected the “zone of danger” requirement because it was “inadequate” (i.e., there would be valid cases that it did not include). In the present case, Samuel was himself within the “zone of danger” created by CHA’s alleged negligence. Strict application of the “substantial physical harm” requirement (designed for persons who were not in the “zone of danger”) is particularly inappropriate for a plaintiff who was in the “zone of danger."
Accordingly, CHA’s motion for summary judgment on Samuel’s claims for negligent infliction of emotional distress is denied.
ORDER
For the foregoing reasons, Defendant’s Motion for Partial Summary Judgment is ALLOWED in part and DENIED in part as follows:
1) The motion is ALLOWED as to all claims alleging negligent provision of security on any theory other than alleged negligent maintenance of the locks or failure to provide alternative accommodations until the locks were repaired,
2) The motion is ALLOWED as to Carlos Ocasio’s claims for loss of consortium (Count XXI); and
3) In all other respects, the motion is DENIED.

In context, the officer’s recommendation appears to be based on concern that the intruder may have had a key. The officer’s recommendation does not appear to be based on any observations about a malfunctioning door lock.

Again, to the extent plaintiffs are claiming that the failure to repair the locks entitled them to “alternative accommodation,” that claim may go forward under §10(j)(3). What may not go forward, is any claim based on CHA’s failure to honor their transfer requests that were based on problems other than the alleged failure to repair the locks.

CHA also attaches great significance to the fact that, at the time the actual injuries to Carlos were inflicted, Carlos and Luciano were no longer on Jefferson Park premises but were somewhere just over the boundary line. Recovery for these injuries does not depend on whether the injuries occurred on CHA property but rather on whether they were a reasonably foreseeable consequence of CHA’s alleged negligence in not repairing the door and window locks of the Rodriguez apartment.

Of course, to the extent that Carlos’ real reason in pursuing Luciano was for revenge or retaliation, such conduct would not be any form of "rescue." For purposes of this summary judgment motion, the court must accept as true Carlos’ version of why he went after Luciano and Carlos’ version of how the confrontation with Luciano unfolded.

For example, if a bystander came upon a robber taking someone else’s wallet, it is foreseeable that the bystander might go to the immediate aid of the victim and be injured in the course of his intervention. Assume the robber ran off with the stolen wallet. It is equally foreseeable that the concerned bystander would run after the robber to try and apprehend him, retrieve the wallet and hold him until police could be summoned, and foreseeable that the perpetrator would resist such efforts and inflict injury on his pursuer in the course of *408 trying to escape. Assistance to a victim can take many forms, including attempting to apprehend the perpetrator of a crime before he can get away from the immediate scene.

Carlos argues that his alleged financial dependence on his mother brings his case within G.L.c. 231, §85X, which provides a parent with a claim for loss of consortium of a dependent adult child. Nothing in the statute provides an adult dependent child with a claim for loss of parental consortium. The statute was passed to overrule Norman, supra, where the Supreme Judicial Court had refused to recognize a parent’s claim for loss of consortium of a child. When the legislature took up the issue, it did nothing to modify the limits on a child’s own consortium claims (as set down in Ferriter and Morgan).